# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| MADINA FERNANDES, | : | Case No. 3:17-cv-00277 |
| | : | |
| Plaintiff, | : | District Judge Thomas M. Rose |
| | : | Magistrate Judge Sharon L. Ovington |
| vs. | : | |
| | : | |
| COMMISSIONER OF THE SOCIAL | : | |
| SECURITY ADMINISTRATION, | : | |
| | : | |
| Defendant. | : | |

# REPORT AND RECOMMENDATIONS[1]

## I.     Introduction

The Social Security Administration denied Plaintiff Madina Fernandes' August 3,

2012 application for Supplemental Security Income.  She brings the present case

challenging that denial.  At issue is the decision by Administrative Law Judge (ALJ)

Elizabeth A. Motta, concluding that Plaintiff is not under a disability and, consequently,

not eligible to receive Supplemental Security Income.  Plaintiff contends, in part, that

ALJ Motta failed to properly evaluate the opinions provided by her treating mental-health

professionals and the opinions of her gastroenterologist, David P. Romeo, M.D.  The

Commissioner maintains that the ALJ properly evaluated the pertinent medical opinions

and that substantial evidence supports the ALJ's decision.

---

[1] Attached is a NOTICE to the parties regarding objections to this Report and Recommendations.

## II.    Background

### A.    Plaintiff's Vocational Profile and Testimony

Plaintiff was 35 years old on the date she filed her application for Supplemental Security Income.  Being under age 50, she is considered a younger person under Social Security Regulations.  20 C.F.R. § 416.963(c).  She has a high-school education and attended college for 3 years.  (Doc. #7, *PageID* #94).  She has no past relevant work.

During an administrative hearing held by ALJ Motta, Plaintiff testified that she is 5 feet 1 inches tall and weighs 190 pounds.  She has a driver's license but drives an average of 2 times a week.  She has difficult driving for more than 30 minutes because her back pain becomes severe and her knees start locking up—"it just gets really painful."  *Id*. at 103.

Plaintiff told the ALJ that her medical issues worsened over the years.  Her health problems include daily arthritis pain in her feet.  She underwent knee surgery in 2011 after which she started noticing more issues with her joints.  She has arthritis in her back, hips, hands, and shoulders.  She explained, "every day I'm in pain."  *Id*. at 96.  Pain in her hands, especially in her last 3 fingers, makes it very difficult to use her hands.  For example, she cannot count out paper money.  Plaintiff also experiences "extreme exhaustion" that causes her legs to "get heavy."  *Id*. at 98.  She estimated that after she is awake in the morning for 2-3 hours, she lies down due to pain and sleepiness ("I can barely keep my eyes open ….").  And as the day goes on, her pain gets worse.

Plaintiff also has issues with irritable bowel syndrome with daily diarrhea, 3 times a day. In addition, she will feel the urge to use the bathroom 3 more times a day but after she reaches the bathroom, she will not need to go. *Id*. at 105.

Plaintiff's last job (in 2012) was part time. It ended, she noted, because "I was having a lot of trouble with … needing breaks and I was ill a lot … and I wasn't able to come in to work all the time." *Id*. at 103. She would call in sick about once a week, and sometimes she would be late for work due to bathroom issues.

In 2012, Plaintiff was having issues with Crohn's disease, knee problems (requiring surgery), anxiety and panic attacks, and depression. Sometime medication helps her mental health, but other times she "just feel[s] bad." *Id*. at 100. She has anxiety every day accompanied by shaking and heart palpitations. She testified, "I get really nervous around people. I get kind of panicky if there's too many people around. And then sometimes like with my depression just all I want to do is sleep. I don't generally bathe myself when that happens. So I don't really take care of myself as well as I should. And, generally, the only time I eat is when my boyfriend makes me something to eat." *Id*. at 107.

Plaintiff stated that she can sit comfortably for about 30 minutes before she starts getting pain in her hips, knees, and back. She can stand comfortably for about 20 minutes before her back, hips, and knees begin to hurt. She can lift and carry 5 pounds. *Id*. at 108.

Plaintiff does not cook or prepare meals; her boyfriend takes care of it. Since 2012, she has not done yardwork or gardening. Sometimes she tries to wash a couple of dishes. Her boyfriend vacuums and dusts. She does her own laundry once a week and puts her clothes away. She generally does not go to the store; her boyfriend does most of the shopping. She does not go outside her home on a regular basis. She has difficulty dressing herself and must sit on a stool when she showers. She does not use a computer or read books, unlike when she was taking college classes. She eats only once a day because she can't bring herself "to even care enough to eat." *Id*. at 102.

**B.    Medical Evidence**

Plaintiff underwent left knee arthroscopic surgery in December 2011 after which she participated in physical therapy. Plaintiff went to the emergency room in May 2012 feeling severe "sharp and crampy" abdominal pain with vomiting and diarrhea. *Id*. at 621. She was admitted with an acute appendicitis and underwent surgery. *Id*. at 624-29. Five days later, she was released from the hospital in stable condition. *Id*. at 630.

December 2012 treatment notes from treating gastroenterologist David P. Romeo, M.D., indicate that he had not seen Plaintiff in over a year. He noted that Plaintiff had lost her health-insurance coverage in May or June 2012. *Id*. at 616. Although she had been asymptomatic on medication, by late July 2012, her symptoms were recurring. Dr. Romeo reported that Plaintiff was experiencing a Crohn's disease flare. She had abdominal pain, cramping, and "upwards of eight to 10 stools per day including nocturnal

episodes." *Id*. He also noted that there "may be bleeding," and Plaintiff had vomited "on occasion." *Id*. She was understandably "miserable and is tearful over the situation." *Id*. Dr. Romeo diagnosed Crohn's disease and placed her back on immunosuppressant therapy. *Id*. at 617. A month later she was doing quite well, although she'd experienced an acute illness with abdominal discomfort and diarrhea. This resolved after a few days. *Id*. at 618.

Plaintiff went to the emergency room on early March 2013 with abdominal pain and diarrhea. She reported that she had stopped taking her steroid medications a week before. A physician diagnosed her with Crohn's disease and treated her with medication. She was discharged with Percocet for pain control, Zofran for nausea, and Prednisone for Crohn's exacerbation. *Id*. at 639-51.

Plaintiff followed up with Dr. Romeo in mid-April. He diagnosed her with Crohn's disease in endoscopic remission and prescribed Bentyl. He noted that she had experienced diarrhea 3 to 4 times per day on 8 of the previous 21 days, but on other days she was constipated. *Id*. at 664. She was also experiencing nausea, bloating, and intermittent abdominal cramping but no ongoing abdominal pain. *Id*.

In May 2013, Dr. Romeo noted that Dicyclomine was helping with her abdominal cramping, but "she still has considerable diarrhea." *Id*. at 661. Dr. Romeo reported no evidence of active Crohn's disease, and thought Plaintiff's diarrhea may be caused by another problem, perhaps irritable bowel syndrome. *Id*. at 662.

In July 2013, Dr. Romeo diagnosed Plaintiff with a history of Crohn's disease, which was currently stable on medication. She was, however, experiencing "frequent diarrhea, controlled with Imodium, which will then lead to constipation." *Id*. at 658. She was also experiencing nausea and cramping, for which Dr. Romeo prescribed medications. *Id*. Plaintiff acknowledges, "Subsequent treatment notes indicate that the medication was helping [her] symptoms." (Doc. #9, *PageID* #1299 (citing, as examples, *PageID* #s 740-748, 834-840, 1042)).

In September 2013, Dr. Romeo completed a form assessing Plaintiff's work abilities. *Id*. at 681-85. He checked-marked responses indicating that she had no restrictions on the amount of weight she could carry or on how long she could stand, walk, or sit in and workday. She could, according to Dr. Romeo, frequently climb, crouch, balance, kneel, stoop, and crawl. He also indicated that Plaintiff could perform light or sedentary work (as the form defined such work). *Id*. at 684-85. But, Dr. Romeo tempered his opinion about Plaintiff's work abilities. He advised, "[She] at times may need to use the restroom at a moment['s] notice or may need to use the restroom frequently—this may occur during any activity." *Id*. at 684. Dr. Romeo also answered written interrogatories stating that he had treated Plaintiff's for Crohn's disease for 9 years. His answers illustrate his belief that her level of functioning deteriorated when she experienced a flare of Crohn's disease, including symptoms of extreme abdominal pain, nausea, and vomiting. He opined, for example, that "as long as she is not having a

Crohn's flare," she could be prompt and regular in work attendance, respond appropriately to supervision, sustain attention and concentration to meet normal work-productivity standards, behave in an emotionally stable manner, respond appropriately to changes in a routine work setting, and accept instructions and respond appropriately to criticism from supervisors. *Id*. at 688-94. When asked more about Plaintiff's ability to withstand work pressure, Dr. Romeo explained, "During a Crohn's flare she might have extreme pain (abd [abdominal]), nausea & vomiting—could impair her from completing her work." *Id*. at 689.

A treatment note from Sarah Khavari, M.D. in April 2015 reveals that Plaintiff reported experiencing "nonstop diarrhea" since the end of January. *Id*. at 1092. She could hardly eat because after she ate, she would have diarrhea. *Id*. Plaintiff felt "exhausted" and "physically broken down." *Id*. She was "always tired" and was having a hard time concentrating due to a constant "foggy" feeling in her head. *Id*.

In January 2016, rheumatologist Thomas W. Henderson, M.D., examined Plaintiff and observed diffuse tenderness in the "small joints of [her] hands as before" (apparently referring to similar results in December 2016). *Id*. at 1049. He diagnosed arthropathy. *Id*

In March 2016, Dr. Romeo noted that Plaintiff continued to have cramping, intermittent nausea, and diarrhea. *Id*. at 1265.

In addition, to Plaintiff's physical health problems and treatments, she has suffered

problems with depression, anxiety, and panic attacks.  Her mental health treatment

records document that, at one time or another, she reported experiencing past abuse and

feeling fear, anxiety, panic attacks, paranoia, difficulty breathing, agitation, anger,

irritability, depression, tearfulness, withdrawal and disconnection from loved ones, loss

of interest in former hobbies and activities, poor sleep, nightmares, fatigue, obsessive

compulsive behavior, decreased self-esteem, hopelessness, helplessness, crying spells,

and becoming easily overwhelmed.  *Id*. at 695-726, 756-94, 955-90, 1052-79.

In October 2013, Plaintiff's treating psychiatrist Dr. Vishnupad and treating

therapist Nicole Jackson provided joint responses to a Mental Impairment Questionnaire.

*Id*. at 727-30. They diagnosed Plaintiff with Major Depressive Disorder, recurrent, and

Panic Disorder.  They check-marked responses identifying Plaintiff's signs and

symptoms as poor memory; appetite disturbance with weight change; sleep disturbance;

mood disturbances; emotional lability; recurrent panic attacks; anhedonia or pervasive

loss of interests; psychomotor agitation or retardation; paranoia or inappropriate

suspiciousness; feelings of guilt/worthlessness; difficulty thinking or concentrating;

suicidal ideation or attempts; social withdrawal or isolation; illogical thinking or

loosening of associations; decreased energy; obsessive or compulsions; intrusive

recollections of a traumatic experience; persistent irrational fears; and generalized

persistent anxiety.  *Id*. at 727.  They also itemized clinical findings including depression,

sleep and appetite disturbance, low energy, memory problems, rumination, impaired

focus and concentration, panic attacks, racing thoughts, heart palpitations, difficulty breathing, intense fear, chills, sweats, clammy hands, and paranoia.  *Id*. at 728.

Dr. Vishnupad and Ms. Jackson also found Plaintiff slightly to moderately limited in some areas of work-related functioning and markedly or extremely limited in several others.  *Id*. at 29.  They thought that she would be absent from work more than three times per month due to her impairments or treatment.  *Id*. at 729-30.

### III.   <u>"Disability" Defined and The ALJ's Decision</u>

Plaintiff's eligibility to receive Supplemental Security Income hinged on whether he was under a "disability" as defined by social security law.  *See* 42 U.S.C. § 1381a; *see also Bowen v. City of New York*, 476 U.S. 467, 470 (1986).  Narrowed to its statutory definition, a person is "considered to be disabled … if he [or she] is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which … can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §1382c(a)(3)(A).

As noted previously, it fell to ALJ Motta to evaluate the evidence connected to Plaintiff's application for benefits.  She did so by considering each of the five sequential steps set forth in the Social Security Regulations.  *See* 20 C.F.R. § 416.920.  Her more significant findings began with her conclusion that Plaintiff had severe impairments— irritable bowel syndrome with history of ulcerative colitis, history of arthroscopic surgery

on her left knee, depressive disorder, and anxiety disorder—but her impairments did not

constitute a disability under the Listings, 20 C.F.R. Part 404, Subpart P, Appendix 1.

ALJ Motta next found that the most Plaintiff could do despite her impairments

(her residual functional capacity, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239

(6th Cir. 2002)) was less than the full range of light work.  She listed Plaintiff's many

limitations as including, for example, "[Plaintiff] does not have to be replaced by another

worker before going to the restroom; [she] can be off task as much as five percent of the

workday for additional bathroom breaks…."  (Doc. #7, *PageID* #72).  Some of Plaintiff's

remaining limitations limit her to low-stress work "with no strict production quotas or

fast pace and only work with a few changes in the work setting and only occasional

contact with the public as part of job duties."  *Id.*

In light of her findings, ALJ Motta determined that Plaintiff could perform a

significant number of jobs available in the national economy.  *Id.* at 79-80.  This wrapped

up her sequential evaluation and led her to ultimately conclude that Plaintiff was not

under a disability and not eligible for Supplemental Security Income.

## IV.    <u>Standard of Review</u>

The Social Security Administration's denial of Plaintiff's application for

benefits—embodied in ALJ Motta's decision—is subject to judicial review along two

lines: whether he applied the correct legal standards and whether substantial evidence

supports his findings.  *Blakley v. Comm'r of Social Sec.*, 581 F.3d 399, 405 (6th Cir.

2009); *see Bowen v. Comm'r of Social Sec.*, 478 F3d 742, 745-46 (6th Cir. 2007).

Reviewing the ALJ's legal criteria for correctness may result in reversal even if the

record contains substantial evidence supporting the ALJ's factual findings.  *Rabbers v.*

*Comm'r of Social Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F3d at 746.

Substantial-evidence review does not ask whether the Court agrees or disagrees with the

ALJ's factual findings or whether the administrative record contains evidence contrary to

those factual findings.  *Rogers v. Comm'r of Social Sec.*, 486 F.3d 234, 241 (6th Cir.

2007); *see Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999).  Instead,

substantial evidence supports the ALJ's factual findings when a "'reasonable mind might

accept the relevant evidence as adequate to support a conclusion.'"  *Blakley*, 581 F.3d at

406 (quoting *Warner v. Comm'r of Social Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)).

Substantial evidence consists of "more than a scintilla of evidence but less than a

preponderance..."  *Rogers*, 486 F.3d at 241.

**V.    Discussion**

Plaintiff contends that the ALJ erred by not properly evaluating the opinions

provided by Dr. Vishnupad and Ms. Jackson.  She maintains that the ALJ improperly

substituted her own interpretation of Plaintiff's mental-health records in place of the

opinions provided by Dr. Vishnupad and Ms. Jackson.  She further objects to the ALJ's

decision to credit state-agency reviewers' opinions even though they did not review a

complete record.  And, she argues that the ALJ's reliance on the alleged lack of objective

signs and findings is not an adequate basis for rejecting treating-source opinions.

Social Security Regulations require ALJs to adhere to certain standards when weighing medical opinions. "Key among these is that greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians, commonly known as the treating physician rule." *Rogers,* 486 F.3d at 242 (citations omitted). The rule is straightforward:

> Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record."

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting in part 20 C.F.R. § 404.1527(c)(2)); *see Gentry*, 741 F.3d at 723.

If the treating medical source's opinion is not controlling, "the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors." *Rogers*, 486 F.3d at 242 (citing *Wilson*, 378 F.3d 541, 544 (6th Cir. 2004)); *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011) (quoting, in part, 20 C.F.R. § 404.1527(d)(2)).

The ALJ placed little weight on Ms. Jackson's opinions due to the absence of "objective signs and findings in the record." (Doc. #6, *PageID* #78). The ALJ observed

that counseling records from Mental Health Services Clark County concerning Plaintiff's treatment "primarily reflect [her] subjective complaints and contain few objective mental status findings. Dr. Vishnupad's records generally show only a depressed and anxious mood, and many other mental status examinations were generally within normal limit. These findings are adequately accounted for by the limitations … for low stress work with occasional public contact." *Id*. The ALJ also found that the record supports only mild to moderate impairment in Plaintiff's social functioning. As a result, she limited Plaintiff to occasional public contact, with no limitations in the ability to interact with coworkers or supervisors." *Id*.

Substantial evidence supports the ALJ's assessment of the opinions provided by Ms. Jackson and Dr. Vishnupad. Although they listed Plaintiff's symptoms, *see* Doc. #7, *PageID* #728, Plaintiff's treatment records with Ms. Jackson and Dr. Vishnupad fail to contain information that reasonably supports their unexplained conclusions about Plaintiff's work limitations and work absences. Instead, Ms. Jackson's treatment notes repeatedly document Plaintiff's reported symptoms without providing meaningful insight into the level of symptom severity Ms. Jackson observed. The most supportive information she provided appears in her indication whether Plaintiff's mood was either "remarkable" or "unremarkable" at each counseling session. These records, however, are minimally helpful to Plaintiff. When she began counseling with Ms. Jackson, she indicated that Plaintiff's mood was remarkable, noting she was anxious/depressed (on

April 17, 2013) and depressed (on April 22, 2013). After those initial sessions, Ms.

Jackson frequently observed that Plaintiff's mood, affect, and thought process were

unremarkable with only occasional references to anxious or depressed moods. *See id.* at

697-09. Additionally, the last treatment note Ms. Jackson wrote a month before

providing her opinions (in November 2013) observed that Plaintiff's mood was

remarkable, anxious, but her affect and thought process were unremarkable. These brief

and conclusory mention of depression and anxiety, along with Ms. Jackson's notes

concerning Plaintiff's self-reported symptoms, provided a reasonable basis for the ALJ to

place little weight on Ms. Jackson and Dr. Vishnupad's opinions. *See* 20 C.F.R.

§4`16.927(c) ("The more a medical source presents relevant evidence to support an

opinion, particularly medical signs…, the more weight we will give that opinion. The

better an explanation a source provides for an opinion, the more weight we will give that

opinion.").

Plaintiff next contends that the ALJ failed to properly evaluate her gastro-

enterologist's, Dr. Romeo's, opinions by providing a conclusory analysis that fails to

adequately consider the longitudinal record of Plaintiff's gastrointestinal symptoms.

The ALJ viewed Dr. Romeo's treatment records as support for her assessment of

Plaintiff's ability to perform a reduced range of light work. The ALJ explained:

> The limitations … for a reduced range of light work take into account
> the claimant's ulcerative colitis, also known as Crohn's disease,
> which appears to be under generally good control. Treatment records
> from [Dr.] Romeo, the claimant's gastroenterologist, confirm the

> presence of this condition, with only an early diagnosis of Crohn's
> disease and nothing active. These notes also document only
> occasional episodes of symptoms, such as diarrhea and abdominal
> pain. A colonoscopy in 2013 revealed no active disease. In addition,
> those records confirm that the claimant's symptoms have been
> generally controlled with medication with minimal complaints and
> few flares of active symptoms reported (Exhibits B3F, B4F, B10F
> B14F, and B20F).

(Doc. #7, *PageID* #74). The ALJ also found that the episodic nature of Plaintiff's

gastrointestinal condition limits her to "light, indoor work with no temperature extremes

and work that allows her to be off task up to 5% of the workday for additional restroom

breaks, with no need to be replaced by another worker for these restroom breaks." *Id*. at

75.

As to Dr. Romeo's opinions, the ALJ gave "deferential weight" to Dr. Romeo's

opinion that Plaintiff could work as long as she was not having a Crohn's flare. The ALJ

found, however, "the record documents no such flare-ups since…" the date she filed her

application for benefits (August 3, 2012). *Id*. at 78. The ALJ repeated that Dr. Romeo's

treatment notes "document no significant Crohn's flares and … do not confirm the

frequency or severity of diarrhea or restroom breaks testified to by [Plaintiff]." *Id*. The

ALJ described Dr. Romeo's records as indicating that Plaintiff's gastrointestinal

condition had been "under relatively good control with only intermittent symptoms.

(Exhibits 24F, B29F, B34F). This again convinced the ALJ that Plaintiff was limited to

work allowing her to be off task 5% of the workday for restroom breaks.

Substantial evidence supports the ALJ's evaluation of Dr. Romeo's opinions and

treatment records. The evidence of record reveals that Plaintiff never had a continuous 12-month period of multiple daily episodes of diarrhea, an essential element of establishing a benefits-qualifying disability. *See* 20 C.F.R. § 416.905 (in order to prove disability, a claimant must prove she had disabling limitation(s) for at least a continuous 12 months) (emphasis added). As the ALJ indicated, Dr. Romeo's own progress notes concerning Plaintiff depict her GI symptoms as generally well-controlled, with only occasional breakthrough symptoms. Indeed, in January 2012—7 months before Plaintiff filed her application for Supplemental Security Income—Plaintiff saw Dr. Romeo for a re-assessment of her Crohn's disease. He observed that she was "doing quite well," and that her abdominal pain and diarrhea had resolved after a short bout, lasting a few days, of symptoms. (Doc. #7, *PageID* #619). Dr. Romeo assessed her Crohn's disease to be "in remission." *Id.* Three months before filing for Supplemental Security Income (in May 2012), Plaintiff presented to her local hospital's emergency room with right-lower-quadrant abdominal pain due to acute appendicitis (not Crohn's), which required the emergency removal of her appendix.

In December 2012, Plaintiff returned to see Dr. Romeo, after not seeing him for almost a year. *Id.* at 616. Dr. Romeo noted that she had been asymptomatic on her medication regimen. Id. But, by late July 2012, her symptoms were recurring (abdominal pain/cramping as well as up to eight or 10 stools per day). *Id.* He noted that she had not lost any weight, a fact reasonably suggesting that her recurrent Crohn's

symptoms had been in control with medication. Dr. Romeo likely realized that something new or additional was happening with Plaintiff, changed her medication regimen. *Id.* at 617.

One month later, Plaintiff reported good results after Dr. Romero had started her on Prednisone at her last visit. Yet, she also reported a flare of symptoms when tapering down of the medication. Even so, under her new medication regimen, she was down to several loose stools per day, generally with some form to them. *Id.* at 670. Symptoms occurring several times a day is reasonably in line with the ALJ's conclusion that Plaintiff could perform work allowing restroom breaks 5% of the workday (which calculates to 24 minutes). At this office visit, moreover, Dr. Romeo assessed Plaintiff as "doing fairly well," and increased her Prednisone dosage. *Id.* at 672.

In early March 2013, Plaintiff returned to the emergency room due to complaints of abdominal pain and multiple bowel movements. She acknowledged that her gastrointestinal symptoms had been under control until she stopped her medications a week earlier. *Id.* at 639. She was discharged from the emergency room with a prescription for Prednisone. *Id.* at 644. A few days later in March 2013, Plaintiff saw Dr. Romeo and reported that she was "doing better" and "feeling better" after resuming Prednisone. *Id.* at 667. In April 2013 Plaintiff reported that during 8 of the last 21 days, she had diarrhea 3 to 4 times per day, and the other days she had been constipated with small hard stools. *Id.* at 664. A recent colonoscopy was negative. Dr. Romeo diagnosed

Plaintiff with "Crohn's disease in endoscopic remission.  She has some variable abdominal complaints but I do not think these are related to inflammatory bowel disease."  *Id*. at 666.

By May 2013, Plaintiff reported that a new medication helped with her abdominal cramping, but not with her diarrhea, which occurred 2 or 3 times most days.  *Id*. at 661.  Dr. Romeo noted that Plaintiff had taken Imodium in the past and it had helped with her diarrhea, but she had not taken much of it recently.  Dr. Romeo explained his diagnostic impression: "Crohn's disease.  We have not been able to document activity recently.  Her recent diarrhea may be from another problem such as irritable bowel syndrome…."  *Id*. at 662.  Dr. Romeo instructed Plaintiff to take Imodium twice daily for diarrhea, and that she could titrate it up or down.  *Id*. at 663.

By July 2013, Dr. Romeo noted that Plaintiff was "doing much better than in the distant past."  *Id*. at 658.  She reported that her frequent diarrhea was "controlled by Imodium" but this would lead to constipation.  *Id*.  She reported nausea and cramping but indicated that Bentyl helped with her cramping.  Dr. Romeo advised her to continue taking Imodium and Bentyl, and he prescribed a new medication for her complaints of nausea.  *Id*. at 658, 660.

One month after Dr. Romeo provided his October 2013 opinions about Plaintiff's ability to work, he noted during her office visit that after placing her on Amitriptyline at her last appointment, the Amitriptyline had "worked extremely well."  *Id*. at 746.  She no

longer had any abdominal pain, her diarrhea had resolved, and she no longer had nausea as before.  Plaintiff was "very pleased" with the results.  *Id*.  Dr. Romeo made virtually the same findings on her later-occurring office visits—for example, she was "doing very well" and had no complaints in February, May, and August 2014.  *Id*. at 740, 743, 838.

A while later, in November 2014, Plaintiff returned to see Dr. Romeo. She reported that she had done well until the previous week.  *Id*. at 834.  She reported variable bowels habits—sometimes she passed small, hard marble-like stools, but later in the day she might have diarrhea.  The night before, she had some lower-abdominal discomfort that she had not experienced for some time.  She also told Dr. Romeo that she still had some discomfort in the morning, but it was much improved.   And, she reported that she was under severe stress and wondered if this could be playing a role in her symptoms.  *Id*.  Dr. Romeo ordered testing and provided her with medication refills.  He believed Plaintiff's symptoms were due to her irritable bowel syndrome, possibly exacerbated by stress.  *Id*. at 836.

Plaintiff did not see Dr. Romeo again for over a year.  *Id*. at 1042.  She saw him in December 2015, and he again documented that she was "doing well," and that while she had a little bit of alternating constipation and diarrhea, she had not had much in the way of symptoms overall since her last visit.  He also noted that she had not had any recent nausea or vomiting and no significant abdominal pain.  *Id*.

Plaintiff's last office visit documented in the record occurred in March 2016.  She

reported cramping, intermittent nausea, and soft to loose stools but no diarrhea. She also reported that the last time she had vomited was several weeks before. Dr. Romeo noted that her CBC and chemistry panel at her last visit were unremarkable, and reiterated that, in the past year, restaging with a colonoscopy showed no evidence of active Crohn's disease. *Id*. at 1265. He advised Plaintiff to take Bentyl for cramping, as he had in the past. *Id*. at 1266-67. Dr. Romeo advised Plaintiff to follow up in three months or sooner, but the record reasonably suggests that she did not again see Dr. Romeo before the ALJ's July 2016 decision.

In light of the aforementioned record evidence, the ALJ reasonably gave little weight to any interpretation of Dr. Romeo's opinion that Plaintiff was unable to work when having Crohn's flares or that she otherwise needed significant restroom breaks above 5% of the workday. Contrary to Plaintiff's contention that the medications Dr. Romeo prescribed her made her drowsy, the record fails to show such reports to Dr. Romeo, and his opinions did not identify drowsiness as a limiting factor for Plaintiff. *See id*. at 681-85.

As such, the aforementioned evidence shows that the ALJ's RFC limitations that allow Plaintiff to be off task for 5% of the workday for restroom breaks, without the need to be replaced by another worker for such breaks, adequately accounts for her symptoms from Crohn's disease, or her gastrointestinal condition of well-controlled irritable bowel syndrome, with only occasional flares.

Accordingly, Plaintiff's Statement of Errors lacks merit.

## IT IS THEREFORE RECOMMENDED THAT:

1.    The Commissioner's decision denying Plaintiff's application for Supplement Security Income (protectively filed on August 2, 2012) be affirmed; and

2.    The case be terminated on the docket of this Court.


July 24, 2018                                          *s/Sharon L. Ovington*
                                                      Sharon L. Ovington
                                                      United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to **SEVENTEEN** days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947, 949-50 (6th Cir. 1981).